# THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>RICHARD ROY SABLAN,<br>Defendant. | CRIMINAL CASE NO. 25-00014<br><br>**DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS AND DISMISS** |

Before the court is Defendant Richard Roy Sablan's motions to suppress and dismiss the case with prejudice ("Motions").[1] ECF No. 32. The court held an evidentiary hearing on the motions. After having heard the evidence and the parties' arguments, and after having reviewed the pleadings and applicable law, the court hereby **GRANTS IN PART** and **DENIES IN PART** the Motions.

## I. INTRODUCTION

### A. Procedural Posture

On November 5, 2025, the Government indicted Defendants Richard Roy Sablan and Marty Pinaula Michalec on three counts: Count 1 – Conspiracy to Distribute Fifty (50) or More Grams of Methamphetamine Hydrochloride in violation of 21 U.S.C. §§ 846, 841(a)(1), and

[1] Defendant Marty Pinaula Michalec joined the motions, adopting and incorporating Sablan's arguments. ECF No. 81.

(b)(1)(B)(viii); Count 2 – Attempted Possession with Intent to Distribute Fifty (50) or More Grams of Methamphetamine Hydrochloride in violation of 21 U.S.C. §§ 846, 841(a)(1), and (b)(1)(B)(viii) and 18 U.S.C. § 2; and Count 4 – Possession with Intent to Distribute Five (5) or More Grams of Methamphetamine Hydrochloride. ECF No. 1.

On July 27, 2026, the court granted Michalec's motion to sever (ECF No. 47) and accordingly, each defendant will be proceeding separately. This decision and order will focus only on Sablan's Motions, filed June 25, 2026. ECF No. 32. Specifically, Sablan requests that the court suppress the evidence seized from the two separate postal packages, the evidence seized from his arrest, the evidence seized from his phone, and the statements he made to the officers. *Id.* If the court grants the suppression motion, Sablan requests that it also dismiss the charges against him.

On October 14, 2026, a suppression hearing on the matter commenced, lasting 7 separate court days.[2] *See* Mins., ECF Nos. 85, 97, 98, 105, 106, 110–11.

**B. Factual Findings**

**1. Package 1 in the Silver Jeep**

On June 21, 2025, United States Postal Inspection Service Task Force Officer Jonathan Calvo ("Officer J. Calvo") obtained a search warrant, MJ 25-00062, for one Priority Mail package addressed to Mantanona Slyrene at 800 Pale San Vitores R. Apt #200 in Tumon, Guam ("Package 1"). Gov't Ex. 2. Officer J. Calvo found an approximately 8,190 gross grams of suspected methamphetamine in the package and sent the substance to the Drug Enforcement Administration ("DEA") for further testing. Gov't Ex. 11-2–11–7. The DEA confirmed the contents of the package to be 7,992.6 grams of methamphetamine hydrochloride with a purity level of 99%. Gov't Ex. 14.

---

[2] This suppression hearing also covered Defendant Michalec's motion to suppress. *See* ECF No. 85.

On June 24, 2025, DEA Task Force Officer Matthew Calvo ("Officer M. Calvo") applied for both tracking and anticipatory warrants. Gov't Exs. 11-1–9, 12-1–12-10. He did not request a separate warrant for a breaching device, indicate the use of a breaching device, or provide pictures of either the tracking or breaching devices in the applications. *See id.* The caption of the tracking application stated "[i]dentify the person to be tracked or describe the object or property to be used for tracking." Gov't Ex. 11-1. The object to be tracked stated "one Priority Mail package addressed to Mantanona Slyrene at 800 Pale San Vitores R. Apt. #200 in Tumon, Guam." *Id.* The application was "based on the facts set forth on the attached sheet" and it requested delayed notice for a period of 30 days. *Id.* The attached affidavit substantiated probable cause because the package had been sent via Priority Mail from a source state and officers found white crystalline substance inside the package which later tested positive for methamphetamine hydrochloride. Gov't Exs. 11-2–11-7. The application also directed the judicial officer to "See Attachment A." Gov't Ex. 11-1. There was no "Attachment A," the only attachments were "Exhibit 1" and "Exhibit 2," which were photographs of Package 1.[3] Gov't Exs. 8, 9, 11-1.

Based on the application, the U.S. Magistrate Judge granted a tracking warrant, MJ 25-00063, for Package 1 (and an anticipatory search warrant, MJ 25-00064) for the Tumon address listed on the package. Gov't Exs. 11-10, 12-1. The tracking warrant was problematic. First, like the application's caption, the tracking warrant's caption identified the object to be tracked as "one Priority Mail package addressed to Mantanona Slyrene at 800 Pale San Vitores R. Apt. #200 Tumon Guam 96913 (See Attachment A)." Gov't Ex. 11-10. However, there was no "Attachment A," only Exhibits 1 and 2 which were photographs of the outside and contents of

[3] The photograph identified as "Attachment A" in MJ 25-00062 was identical to the photograph in MJ 25-00063, but was identified as "Exhibit 1."

the package within the application respectively. *Id.* Second, the section stating, “I find that the affidavit(s), and any recorded testimony, establish probable cause …,” authorizing officers to install and use a tracking device, was left unchecked. *Id.* Last, the section authorizing the installation of a tracking device into private property without the owner’s approval was blank. *Id.* The Magistrate signed the tracking warrant to “begin use of the object or complete any installation authorized by the warrant by July 4, 2025.” *Id.* The Magistrate also signed the anticipatory warrant, finding probable cause to search “800 Pale San Vitores Rd. Apt.# H-200, Tumon, Guam 96913,” provided that Package 1 was delivered and brought inside the residence. Gov’t Ex. 12-11. The anticipatory warrant incorporated “Attachment B,” which identified Package 1 as the “MANTANONA package addressed to Mantanona Slyrene 800 Pale San Viroties Rd. Apt #200 Tumon Guam 96913.” Gov’t Exs 12-11–12-14.

After obtaining both warrants for Package 1, Officer J. Calvo testified that the officers replaced the contents of Package 1 with sham material, clue spray, a breaching device, and a GPS tracking device.[4]

On June 25, 2025, the officers conducted a controlled delivery and delivered Package 1 to its addressed location at the Garden Villa Hotel in Tumon, Guam. According to Officer M. Calvo’s testimony, a red Jeep pulled into the entrance of the Garden Villa Hotel, an individual retrieved Package 1, and then brought it to Apartment #200. After leaving the package in the apartment, the individual departed in the red Jeep. The same individual later returned to Apartment #200, this time in a silver Jeep, retrieved Package 1, and left the Garden Villa Hotel premises. After the silver Jeep left, Officers observed via GPS that Package 1 began to move. The officers began tracking the package’s movement in the silver Jeep. However, they lost visual

[4] Officer J. Calvo testified that the sham material used here resembled methamphetamine hydrochloride and that clue spray is a substance that identifies people who have touched the contents of the package.

contact of the silver Jeep at Chalan Rosario in Yigo. At approximately 5:01 p.m., the silver Jeep pulled into the G-Mart parking lot in Yigo. Def.'s Ex. AA. At 5:04 p.m., a silver Toyota Corolla entered the parking lot and parked next to the silver Jeep. Def.'s Ex. AA. Soon after, an individual exited the Corolla and entered the passenger side of the silver Jeep. *Id.* After the breaching device went off and signaled the officers that the package had been breached, the officers arrived at the parking lot at around 5:07 p.m., four minutes after the Corolla entered the parking lot. *Id.*

Officers found Sablan and Michalec in the silver Jeep with Package 1 opened, clue spray on both of their hands, drug paraphernalia in the vehicle, fifty-two gross grams of suspected methamphetamine hydrochloride, and $2,165 in U.S. currency. Gov't Exs. 7, 9.

**2. The Toyota Corolla Search**

After patting down both defendants, the officers found a pair of car keys on Michalec but did not know that the Corolla belonged to him. Def's Ex. H004; Gov't Ex. 7-9–7-10. There was no testimony establishing that the officers knew Michalec owned the vehicle. To the contrary, Officer M. Calvo acknowledged that he assumed Michalec drove the Corolla because he had to have arrived at G-Mart to meet with Sablan somehow. The officers began to turn their attention to the Corolla. Def.'s Ex. AA. At around 5:08 p.m., four officers, including Guam Customs and Quarantine Agency Officer Rafaele Sgambelluri ("Officer Sgambelluri"), looked through the vehicle for the possibility that a third accomplice would be hiding in the Corolla. *Id.* The officers peered through nearly all sides of the vehicle: the rear window, the rear passenger and driver-side windows, and the front windshield. *Id.* The officers did not find anyone. Several minutes later, Officer Sgambelluri peered into the Corolla again to double-check for any suspects. *Id.* He did not find anyone. At around 5:18 p.m., long after Sablan and Michalec had been detained and taken away, Officer Sgambelluri unlocked the passenger-side door of the Corolla, where he saw

white substance in the pocket of the driver's side door. *Id.*; Gov't Ex. 7-15. Based on Officer Sgambelluri's finding of the contraband, the officers searched the vehicle and, upon opening the center console, discovered additional white substances that were later confirmed by the DEA to be methamphetamine hydrochloride. Gov't Ex. 7-13–7-14. The officers seized the contraband found in the pocket of the driver's side door and in the center console. Def.'s Ex. AA. At around 5:23 p.m., Officer Sgambelluri drove the Corolla from the parking lot for impoundment. Def.'s Ex. AA. DEA Officer Adam Grey ("Officer Grey"), however, later testified that car was parked at the law enforcement building's parking lot. He also testified that the officers released the car after they conducted an inventory search, and that it was never turned over to the United States Marshals Service for any formal impoundment.

**3. Package 2**

On June 27, 2025, Guam Police Department Officer Jeremiah Ryan Vega De Chavez ("Officer De Chavez") received a phone call from an employee at the Garden Villa Hotel, informing him that a U.S. Priority Mail package ("Package 2") addressed to Slyrene Mantanona had been delivered to 800 Pale San Vitores R. in Tumon, Guam. This package's address was identitical to Package 1's address, however, it did not include "Apt # 200" on the address. Officers De Chavez, J. Calvo, and Grey responded to the call and arrived at the Garden Villa Hotel, where Package 2 sat on the front desk of the hotel lobby. Without warrants, the officers seized the package, transported it to the Barrigada post office, and arranged for a canine unit to conduct a sniff test. The dog sniff was positive for narcotics. Based on that information, the next day, Officer J. Calvo obtained a search warrant for Package 2, MJ 25-00066, and found what DEA later confirmed to be 9,760 grams of methamphetamine hydrochloride with 99% purity level. Gov't Exs. 4, 16.

## II. STANDARD OF REVIEW

On a motion to suppress, the controlling burden of proof imposes no greater burden than proof by a preponderance of the evidence. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). The defendant has the burden of persuasion in establishing that his own Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005). The prosecution, as the proponent of the evidence, must bear the burden of showing that the evidence challenged was reasonable under the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

## III. DISCUSSION

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The exclusionary rule bars evidence collected in violation of the Fourth Amendment from being used at trial. *United States v. Shetler*, 665 F.3d 1150, 1156 (9th Cir. 2011). Additionally, under the fruit of the poisonous tree doctrine, "evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). However, even though warrantless searches are typically "*per se* unreasonable under the Fourth Amendment[,]" they are reasonable when there is a valid "established and well-delineated exception." *Arizona v. Gant*, 556 U.S. 332, 338 (2009); *Verdun v. City of San Diego*, 51 F.4th 1033, 1037–38 (9th Cir. 2022). The Government bears the burden of proving that such an exception exists. *United States v. Scott*, 705 F.3d 410, 416-17 (9th Cir. 2012).

Sablan avers four grounds for how the Government violated his Fourth Amendment Rights. Def.'s Br. Supp. 2, ECF No. 32. First, the Government placed a tracking device in Package 1 based on a deficient warrant. *Id.* Second, the Government placed a breaching device in Package 1 without express authorization in the warrant. *Id.* Third, the Government seized Package 2 without a warrant. *Id.* Last, the Government searched his cellphone without his consent or a warrant. *Id.* Accordingly, Sablan contends the evidence from the packages, his resulting arrest, his phone, and his statements should all be suppressed and that the case against him should therefore be dismissed.

**A. Standing**

As a preliminary matter, the Government counters that Sablan lacks a protected constitutional interest in either of the packages. Gov't's Opp'n to Def.'s Mot. to Suppress 5–6, ECF No. 40.

A defendant can only invoke the exclusionary rule pursuant to the Fourth Amendment if they have a constitutional interest in the property searched or seized. *U.S. v. Hoang*, 486 F.3d 1156, 1159 (9th Cir. 2007). The defendant has the burden of establishing the search or seizure violated his legitimate expectation of privacy in a particular place under the totality of the circumstances. *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991)
Individuals have a legitimate expectation of privacy in sealed packages. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). This expectation of privacy extends to both the sender and the addressee of the package. *United States v. Hernandez*, 313 F.3d 1206, 1209–10 (9th Cir. 2002). However, the Supreme Court and the Ninth Circuit has yet to address whether this expectation of privacy extends to an individual who is neither the sender nor the addressee. *See United States v. Lozano*, 623 F.3d 1055, 1062 (9th Cir. 2010). At present, there is currently a split among Circuit courts as to whether such an individual is afforded that expectation of

privacy. *See United States v. Morta*, No. 1:21-CR-00024, 2022 WL 1447021, at *6–8 (D. Guam May 9, 2022) (discussing in depth whether a third-party individual has an expectation of privacy in a package, and if so, which test to apply). This court has previously rejected a bright-line rule denying third-party individuals an expectation of privacy because it would deter innocent uses of monikers and create a "chilling effect on an established societal practice." *Id.* at *9 (illustrating a legitimate reason why an individual would use an alias to receive packages and recognizing it as an established societal practice). Accordingly, this court finds that a third-party individual may still have a legitimate expectation of privacy if there are "*some other indicia* indicating ownership, possession, control, or connection to that mail or package." *Id.*; *see also United States v. Sheldon*, 351 F.Supp.2d 1040, 1044 (D. Haw. 2004) (considering ownership and control as factors in determining a defendant's legitimate expectation of privacy in the property). To determine ownership, possession, control, or connection, courts look at the "the ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." *Id.* (citing *United States v. Stokes*, 829 F.3d 47, 53 (1st Cir. 2016)).

Although Sablan is neither the sender nor addressee, the court nevertheless finds that he has a legitimate expectation of privacy as a third-party individual in the two packages. When Officer M. Calvo interviewed Mantanona, the addressee, she stated that she rented out the apartment listed on the packages to Sablan and signed a form authorizing him to receive mail at the address. Def's. Ex. C. Mantanona was "stunned" when officers told her that her name was being used to receive packages because "any packages ever sent to Garden Villa [Hotel] were for Sablan." *Id.* Essentially, Mantanona surrendered her expectation of privacy in the packages to Sablan: she rented out the apartment to Sablan, was not expecting to receive packages at that address, and did not know that her name was being used to receive packages. Accordingly,

Sablan has a legitimate expectation of privacy in the packages based on his possessory interest as the tenant of the address, his authorization to receive mail, and Mantanona's express claim that all incoming packages were intended for him. That said, the court finds that Sablan is protected under the Fourth Amendment and has standing to challenge the alleged violation that relate to Packages 1 and 2.

**B. The Tracking Device**

Sablan first argues that the Government installed a tracking device pursuant to a deficient tracking warrant. Based on the unchecked and uncompleted portions of the signed tracking warrant, Sablan argues the tracking warrant was deficient for two reasons. First, Sablan argues the tracking warrant did not have "a finding of probable cause." Def.'s Br. Supp. 8. Second, the "purported" tracking warrant did not describe the object to be searched. *Id.* at 8–9.

Magistrate judges have the authority pursuant to Rule 41 to issue warrants for tracking devices. Fed. R. Crim. P. 41(b)(4). A magistrate judge must issue the warrant if "there is probable cause to search for and seize a person or property or to install and use a tracking device." Fed. R. Crim. P. 41(d)(1). Fundamental violations of Rule 41 are subject to "automatic" suppression. *United States v. Manaku*, 36 F.4th 1186, 1190 (9th Cir. 2022). Fundamental violations are "those that result in clear constitutional violations." *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1283 (9th Cir. 1992). Even so, an officer's reliance on a fundamentally deficient warrant may be permissible if the "officers can show objective good faith reliance as required by *Leon*." *Id.*

The court begins by finding that the tracking warrant is sufficiently particular in describing the object to be searched.[5] Here, the warrant's caption identified the object to be

[5] At the suppression hearing, Officer J. Calvo testified that, although he was aware of the caption on the tracking warrant, he did not know that the warrant must be sufficiently particular. Officer J. Calvo's lack of legal knowledge reflects a deficiency in training and reinforces the demand that the DEA needs to better train its officers.

tracked, "One (1) U.S. Priority Mail Package Bearing the Printed Address of Mantanona Slyrene 800 Pale San Vitores Rd. Apt #200 Tumon Guam 96913 (See Attachment A)." Gov't Ex. 11-10. Although there was no "Attachment A," the exhibits accompanying the warrant are photographs of Package 1.[6] Therefore, there was no constitutional or technical error as to particularity because the object to be tracked was explicitly stated.

The tracking warrant, however, did not clearly reflect a finding of probable cause because the box indicating such a finding was left unchecked. *Id.* The application and the accompanying affidavit stated that probable cause exists based on the findings of methamphetamine hydrochloride in Package I. Officer M. Calvo testified that the Magistrate Judge stated over the telephone that he had found probable cause. Thus, the Magistrate Judge likely found probable cause but inadvertently did not indicate so on the face of the warrant. Despite this, the court finds that the tracking warrant lacks a finding of probable cause because it did not memorialize the Magistrate Judge's findings and the telephone colloquy was unrecorded. Therefore, the court finds that the tracking warrant is deficient pursuant to the Fourth Amendment. *See* U.S. Const. amend. IV.

Additionally, the court separately finds that the Government violated Rule 41 when it conceded that it failed to provide Sablan with a copy of the tracking warrant on or by the 30-day deadline as ordered by the Magistrate Judge. The Government conceded that it turned over the copy during the discovery deadline, which was well beyond the time authorized for delayed notice.[7] *See United States v. McGrew*, 122 F.3d 847, 849–50 (9th Cir.1997) (holding that officers violated the Fourth Amendment when they did not serve the suspect with a copy of a sufficient warrant during the search of her home or at any time after). Although the Government

---

[6] Exhibit 1, which was misidentified as "Attachment A," was contained in the June 21, 2025 search warrant (MJ 25-00062), as discussed above. The same Magistrate Judge issued the June 21, 2025 search warrant.

[7] The court finds it troubling that the Government did not provide Sablan with the notice until discovery.

admitted that it withheld the tracking warrant from Sablan until discovery, it tried to justify the delay by pointing to the Magistrate's extensions of the sealing order through August 7, 2026. *See* ECF Nos. 3, 6, 8, 10. But sealing the tracking warrant only shields it from public disclosure. It does not allow the Government to circumvent its duty to disclose the warrant to Sablan, particularly where the Government never filed a request to extend the delayed notice period.

The Government argues that despite the deficiencies above, the tracking warrant is nevertheless sufficient under *United States v. Leon*, 468 U.S. 897 (1984), because the officers relied on it in good faith. Indeed, the exclusionary rule is designed to deter unlawful police conduct rather than to penalize officers for errors in the legal authorities they rely on in carrying out their duty. *See Leon*, 468 U.S. at 916. That said, when an officer acts "in the objectively reasonable belief that [his] conduct did not violate the Fourth Amendment," evidence seized under the authority of a warrant that is later invalidated should not be suppressed. *Id.* at 918. For the good faith exception to apply, "the officer's affidavit must establish at least a colorable argument for probable cause." *United States v. Luong*, 470 F.3d 898, 903 (9th Cir.2006) (citing *Leon,* 468 U.S. at 923); *see also United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) ("The point is that officers who present a colorable showing of probable cause to a judicial officer ought to be able to rely on that officer's ruling in executing the warrant."). This exception does not apply when the warrant is so "facially deficient that executing officers cannot reasonably presume it to be valid (i.e., it fails to specify the place to be searched or the things to be seized)." *Leon*, 468 U.S. at 923.

Sablan argues the warrant is so plainly deficient that no officer can rely on it, because it was blank "with no finding of probable cause and no description of the item to be searched [which] can never be seen as valid." Def.'s Reply to Gov't's Opp'n 10, ECF No. 54. The court disagrees and finds the tracking warrant sufficiently particular because it clearly described in the

caption the "object to be tracked" as "One (1) U.S. Priority Mail Package Bearing the Printed Address of Mantanona Slyrene 800 Pale San Vitores Rd. Apt #200 Tumon Guam 96913 (See Attachment A)." Gov't Ex. 11-10. Additionally, officers reasonably relied on the Magistrate Judge's assurance that the tracking warrant rested on probable cause. In issuing the warrant, the Magistrate Judge reviewed the affidavit which states that the package came from a source state via Priority Mail and that the officers found methamphetamine hydrochloride inside of it. The methamphetamine hydrochloride found in the package is the *corpus delicti* of the offense, therefore establishing probable cause for the tracking warrant. Based on the factual attestations in the affidavit and the testimony of Officer M. Calvo, who testified that the Magistrate Judge stated orally over the phone that he found probable cause, the court finds that the officers acted in reasonable good-faith reliance on the validity of the warrant.[8] *Cf. Luong*, 470 F.3d at 905 ("Where the affidavit itself lacks *all* indicia of probable cause, it would unduly undermine the foregoing rule to permit extrinsic indicia of probable cause to be presented through an unsworn, unrecorded oral colloquy."). Accordingly, under *Leon*, the court finds that the evidence obtained pursuant to the tracking warrant falls under the good-faith exception and will therefore not be suppressed.

**C. The Breaching Device**

Next, Sablan argues that the installation of the breaching device was unconstitutional because the tracking warrant did not expressly authorize the use of a breaching device. Def.'s Br. Supp. 11–12.

Section 3117(b) of Title 18, United States Code, defines a "tracking device" as "an electronic or mechanical device which permits the tracking of the movement of a person or

---

[8] A magistrate judge's determination that probable cause exists and that a warrant is appropriate is afforded "great deference" "[b]ecause a search warrant 'provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer.'" *Leon*, 468 U.S. at 913–14.

object." 18 U.S.C. § 3117(b). In construing this definition, Congress did not intend to "expand or contract the definition of what might constitute a tracking device."[9] Fed. R. Crim. P. 41 advisory committee's note to 2006 amendment. The "amendment is based on the understanding that the device will assist officers only in tracking the movements of a person or property." *Id.* Warrants are not required to "include a specification of the precise manner in which they are to be executed." *Dalia v. United States*, 441 U.S. 238, 257 (1979); *see United States v. Grubbs*, 547 U.S. 90, 97 (2006). Therefore, officers have discretion in how they perform "a covert operation[,]" but they still "must abide by the 'general' protections of the Fourth Amendment." *United States v. Alverez-Tejeda*, 491 F.3d 1013, 1016 (9th Cir. 2007).

Here, Officer M. Calvo testified it is common practice to place both breaching and tracking devices together when officers execute a tracking warrant. He explained that the breaching device placed inside Package 1 is a mechanism that triggers an audible alert the moment the package is opened. Unlike a tracking device, the breaching device does not contain a GPS that would have allowed officers to track its whereabouts. Because the breaching device does not fall within the definition of a tracking device, it did not need to be stated on the tracking warrant. *Grubbs*, 547 U.S. at 97 ("The Fourth Amendment … specifies only two matters that must be 'particularly describe[ed]' in the warrant: 'the place to be searched' and 'the persons or items to be seized.'"). Accordingly, the court finds that the placement of the breaching device did not violate the Fourth Amendment.

**D. The Seizure of Package 2**

As to the search of Package 2, Sablan argues that it was unconstitutionally seized because no probable cause exists that would justify the warrantless seizure. Def.'s Br. Supp. 12. Though

---

[9] Committee reports should be considered as authoritative legislative history and should be given great weight. *See see Garcia v. United States*, 469 U.S. 70, 76 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill[.]").

the Government initially argued that it detained the package rather than seized it, it later conceded at the suppression hearing that it was a seizure. After the officers seized the package, they took it to the post office and had a narcotics detection dog sniff it. Only after the dog alerted to the presence of narcotics did the officers obtain a search warrant.

"The Fourth Amendment 'protects two types of expectations, one involving 'searches,' the other 'seizures.''" *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027–28 (9th Cir. 2012) (citing *Jacobsen*, 466 U.S. at 113). A seizure of property occurs when there is a meaningful interference with an individual's possessory interest in that property. *Id. United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir. 2002). For postal mail, that possessory interest "is in the timely delivery of a package." *Id.*; *see also United States v. Vasquez*, 213 F.3d 425, 426 (8th Cir. 2000) (holding that no detention occurred because officers neither delayed the package nor disrupted its normal processing). A warrantless seizure of property is justified under the Fourth Amendment when officers "have probable cause to believe that [the] container holds contraband or evidence of a crime" and if "exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States v. Place*, 462 U.S. 696, 701 (1983).

The Government initially argued that there was reasonable suspicion to justify the seizure, and probable cause is not needed. Gov't's Opp'n 7. To support its contention, the Government directs this court to look at *Hoang* and *Hernandez* as controlling authorities. *Id.* at 6–7. But the Government's reliance on those cases is unavailing because *Hoang* and *Hernandez* are distinguishable from this case. There, the Ninth Circuit found that reasonable suspicion was sufficient because the government intercepted packages that remained in the stream of mail before they were delivered. *See Hoang*, 486 F.3d at 1158 (diverting package to a FedEx hold room); *Hernandez*, 313 F.3d at 1208 (intercepting package before delivery). Here, the officers

confiscated Package 2 after it had already been delivered to the Garden Villa Hotel, when it was no longer in the stream of mail.[10] Therefore, by taking a package that had already been delivered, the officers meaningfully interfered with Sablan's possessory interests by taking away his right to receive the package which resulted in a seizure. Because the officers did not have a warrant to seize the package, they needed probable cause, exigencies of the circumstances, or a valid recognized exception to the warrant requirement. *See Place*, 462 U.S. at 701.

The Government maintains that the officers acted lawfully in seizing Package 2 merely because it had certain similarities to Package 1, which the officers knew contained narcotics based on their search of Package 1 days prior. [11] Gov't's Opp'n 7. Specifically, both packages originated in California, a source state, were sent by U.S. Priority Mail, and had an identical address for the addressee, except that Package 2 did not include "Apartment 200." *Id.* However, the name and address for the sender were entirely different in both packages. Package 1 was sent by "Hayden Mitchell" at "329 Oak View Dr. San Carolos CA, 94070," while Package 2 was sent from "Alina Ruskovoloshina" at "1390 Platt Avenue Milpitas CA 95035-6518." *See* Gov't Exs. 4-8, 11-12. In addition, the addressee name appeared in a different order: Package 1 listed "Mantanona Slyrene," while Package 2 listed "Slyrene Mantanona." *Id.*

The Government's reliance on the officers' prior discovery of narcotics in Package 1 and the similarities between the two packages are misplaced. These facts do not independently establish that Package 2 contained narcotics. Officer J. Calvo's testimony confirms that the officers knew they lacked probable cause at the time of the seizure. He testified that it was the

[10] During his testimony, Officer J. Calvo claimed that Package 2 was still "live" within the stream of mail even after it had been delivered because it was possible that the package had been delivered to the wrong address. He later conceded that Package 2 was delivered to the proper address. Officer J. Calvo offers no meaningful explanation of what "live mail" is or how it affects a package after it has been delivered. The Government offered no legal authorities to support this proposition. Thus, the court rejects Officer J. Calvo's explanation that the officers were justified in seizing Package 2's seizure because it was considered "live."

[11] At the suppression hearing, Officer De Chavez also testified that he found the package suspicious because the label indicated that the package contained toys valued at $900, but did not explain why this was suspicious.

positive sniff that gave him probable cause to apply for the search warrant. The Fourth Amendment, however, does not authorize the Government to justify a warrantless seizure by relying on probable cause developed after the fact. The officers' actions must be evaluated by what they knew at the time of the seizure, not what they learned afterward.[12]

Accordingly, the court finds that the officers seized Package 2 in violation of the Fourth Amendment. Package 2 and any evidence as a result of that illegal seizure are hereby suppressed.

**E. The Cellphone Search**

Sablan contests the search of his cellphone and argues that the Government illegally searched it without his consent. Def.'s Br. Supp. 13–14.

Officers conduct a Fourth Amendment search when they analyze digital information on an individual's cellphone. *Olson v. County of Grant*, 127 F.4th 1193, 1198 (9th Cir. 2025) (citing *Riley v. California*, 573 U.S. 373, 378 (2014)). That search is subject to the Fourth Amendment's warrant requirement unless there is a valid exception. *See Olson*, 127 F.4th at 1199–1200. Relevantly, consent is one exception to the Fourth Amendment's warrant requirement. *United States v. Taylor*, 60 F.4th 1233, 1242 (9th Cir. 2023). Consent must be voluntary, unequivocal, and specific. *Id.* at 1243 (citing *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011)). Voluntariness is determined based on the totality of the circumstances and it focuses on "five non-exclusive factors: (1) whether defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained." *Id.* (internal quotation marks and citations

[12] Additionally, when Officer J. Calvo applied for a search warrant for this package, he omitted from the affidavit read by the Magistrate that the officers had already illegally seized the package. The court is disturbed with the Government's conduct. In omitting this critical fact, the Government left the Magistrate Judge with the impression that the dog sniff occurred before the seizure of Package 2 when it, in fact, occurred after. Such conduct demonstrates that the DEA needs to better train its Task Force Officers.

omitted). And the scope of consent is limited to what a reasonable person would "have understood by the exchange between the officer and the suspect[.]" *Olson*, 127 F.4th at 1199.

Sablan does not argue that his consent was involuntary under a valid exception, such as coercion or duress. Instead, he argues that he did not consent because the Government did not provide the completed "Consent to Search" form until after the discovery deadline, which violated the court's scheduling order and *Brady* advisement. Def.'s Reply 2 n.2; Gov't's Opp'n 10. But this argument is untenable because he neither denies the existence of the consent form nor that he had filled it out. Sablan cannot now revoke his consent at whim merely because the form that he previously signed was given to him later in violation of the court's scheduling order. Accordingly, the court finds that Sablan never disputed his consent. His argument is meritless. He has not cited any cases in support of this argument.

**F. Fifth Amendment Claims**

Finally, Sablan claims his Fifth Amendment right to due process was violated when a breaching device was placed in the package without express warrant authorization, when the magistrate judge did not check the box finding probable cause in the search warrant for the tracking device, when Package 2 was seized, and when his phone was searched without consent. ECF No. 32, at 2. The Fifth Amendment states "No person shall be … deprived of life, liberty, or property, without due process of the law[.]" U.S. Const. amend. V.

To support his argument, Sablan vaguely cites to *Illinois v. Gates*, *Coolidge v. New Hampshire*, *United States v. Karo*, *Daniels v. Williams*, and *County of Sacramento v. Lewis*, for the proposition that the Fifth Amendment guarantees due process protections through the warrant process. *See* Def.'s Br. Supp. 9–11. Sablan's reliance on these cases is inapposite because these cases do not stand for that proposition. In fact, a concurrence in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), states "[t]he majority does not purport to rely on the Fifth Amendment to

exclude the evidence in this case." *Id.* at 499 (Black, J., concurring in part and dissenting in part). Thus, the court rejects Sablan's Fifth Amendment claim.

## III. CONCLUSION

Based on the above, the court hereby **GRANTS IN PART** and **DENIES IN PART** Sablan's Motions. In particular, the motion to suppress the methamphetamine contained in Package 1, $2,165 in U.S. currency, and the evidence resulting from the cellphone search is **DENIED**. The motion to suppress the methamphetamine found in Package 2 is **GRANTED**. The motion to dismiss the case is **DENIED**. The court shall issue a separate order setting the trial schedule.

**SO ORDERED.**

**Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Nov 25, 2026**